UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:25-cv-20926

CHRISTINA ANNUCCI,
Individually, and as Personal
Representative of the Estate
of RALPH ANNUCCI,

       Plaintiffs,

v.

CARNIVAL CORPORATION,

       Defendant.

_____/

**COMPLAINT FOR DAMAGES
AND DEMAND FOR TRIAL BY JURY**

Plaintiffs, CHRISTINA ANNUCCI, individually, and as Personal Representative of THE ESTATE OF RALPH ANNUCCI (RALPH ANNUCCI is hereinafter referred to as the "DECEDENT"), by and through undersigned counsel, sue Defendant, CARNIVAL CORPORATION, (hereinafter "CARNIVAL"), and demand trial by jury, and state:

**PARTIES AND JURISDICTION**

1.    This is an action for damages which exceed Seventy-Five Thousand ($75,000.00) Dollars and this Court has diversity jurisdiction pursuant to 28 USC §1332.

2.    In the alternative, this Court has admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.

3.    On or about March 2, 2024, DECEDENT RALPH ANNUCCI'S incident occurred, while he and his wife, CHRISTINA ANNUCCI, were fare paying passengers on CARNIVAL's vessel, the CARNIVAL *Horizon*.

4.     CHRISTINA ANNUCCI is the widow and survivor of the DECEDENT, and is the duly appointed Personal Representative of THE ESTATE OF RALPH ANNUCCI. Attached hereto and made a part hereof as Exhibits 1 and 2 are copies of the "Decree Granting Letters of Administration with Limitations," as well as a copy of the "Letters of Administration with Limitations," both issued on February 5, 2025, by the Monroe County Surrogate's Court, of Rochester, New York.

5.     DECEDENT is also survived by his two children, DAVID ANNUCCI and CHRISTOPHER ANNUCCI.

6.     At all times material CHRISTINA ANNUCCI, as Personal Representative of THE ESTATE OF RALPH ANNUCCI, was and is a resident and citizen of the State of New York.

7.     At all times material, CARNIVAL was and is a foreign corporation with its principal place of business in Miami-Dade County, Florida, and therefore a citizen of the State of Florida for jurisdictional purposes.

8.     Suit is filed in federal court because of the federal forum selection clause in the passenger contract ticket issued by CARNIVAL.

9.     At all times material, the ship's doctors and nurses were agents of CARNIVAL, and were at all times material acting within the scope and course of their agency with CARNIVAL.

10.    At all times material, CARNIVAL was the owner and/or operator of the cruise ship, the CARNIVAL *Horizon*.

11.    On March 2, 2024, DECEDENT and CHRISTINA ANNUCCI were fare passengers on the CARNIVAL *Horizon*.

12.    All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

## DEFINITIONS AND FACTUAL ALLEGATIONS

13.    At all times material hereto, CARNIVAL owned, leased, chartered, operated, maintained, managed, and/or controlled the subject cruise ship, the CARNIVAL *Horizon*, and the subject ramp.

14.    Hereinafter, the phrase, the "subject ramp," refers to the ramp on the CARNIVAL *Horizon* on the deck 5 liquid lounge described in paragraph 18, as well as the lack of adequate handrails for this ramp.

15.    On or about March 2, 2024, between approximately 10:00 p.m. and 12:00 a.m., DECEDENT and CHRISTINA ANNUCCI were entering the *Horizon*'s theater on deck 5. DECEDENT was riding a mobility scooter and encountered the unreasonably steep ramp. The lighting was also not reasonably adequate, and there were no handrails that could adequately be grasped. As a result, when DECEDENT traversed this unreasonably steep ramp, the scooter gained momentum and became uncontrollable, causing DECEDENT to fall and sustain serious injuries.

16.    The dangerous conditions of the subject ramp and lack of adequate handrails were both but-for causes of DECEDENT'S injuries. Hereinafter, the unreasonable steepness of the ramp, lack of reasonable lighting, and lack of adequate handrails shall be referred to as the "dangerous conditions."

17.    On March 4, 2024, as his condition caused by his fall deteriorated, DECEDENT'S family took him to the ship's doctor, and he complained of hip pain and inability to ambulate. The ship doctor saw him, took an x-ray, and diagnosed him with a displaced femoral neck fracture, which required an expedited medical. DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility. The ship's doctor should have recognized that DECEDENT was in a critical medical condition,

requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped at the time to properly treat. CHRISTINA ANNUCCI'S alleged refusal to medically disembark DECEDENT off the ship was contrary to his best interest and well being, she did not have the legal right to make these decisions for him. Moreover, CARNIVAL should have paid for the medical evacuation and sought collection afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion. CARNIVAL is more concerned about its profits than the wellbeing of DECEDENT.

18.    The ship's doctor instead had DECEDENT airlifted to Broward Medical Center in Ft. Lauderdale three days later. DECEDENT had surgery on March 9th, 2024, at Broward Medical Center, and was hospitalized for approximately 30 days. At Broward Medical Center, the commode was too small for him. His hip popped out, and an infection set in. The commode stuck to him. He passed away shortly thereafter.

19.    CARNIVAL either knew or should have known of the dangerousness of the subject ramp due to reasons that include, but are not limited to, the following:

   a.  CHRISTINA ANNUCCI observed a CARNIVAL crew member in the immediate vicinity of the subject ramp prior to and at the time of his incident, close enough that this crewmember was able to see the subject ramp and its unreasonable steepness (which was visible to trained crewmembers who had training to watch out for dangers such as these, but not for laypeople such as DECEDENT), such that a reasonable fact finder may infer that this crew member was or should have been familiar with the ramp, as well as the danger thereof, but this crewmember did not assist or warn DECEDENT prior to the incident. CARNIVAL knows that passengers will use the subject ramp, and that it was important that it not be unreasonably steep.

b. CARNIVAL participated in the installation and/or design of the subject ramp, or alternatively, CARNIVAL approved of the subject ramp with its design defects present after having been given an opportunity to inspect the subject ramp, such that CARNIVAL should have known of the design defects of the subject ramp before providing it for public use.

c. Prior to the subject incident, CARNIVAL installed and/or refitted ramps that were less steep, as well as handrails that were adequate to grasp, on other ships and/or other parts of the subject ship.

d. There are relevant safety standards/recommendations/other guidelines regarding the safety of the subject ramp, including, but not limited to, prohibitions and/or recommendations against ramps such as the one DECEDENT encountered. The Americans with Disabilities Act ("ADA") requires that the slope of a ramp be 8.33%, but CARNIVAL exceeded this. CARNIVAL should have known of these standards/recommendations/other guidelines because whether such standards/recommendations/other guidelines are legally required for CARNIVAL to comply with or not, a fact-finder is entitled to determine, if it so choses, that these standards/recommendations/other guidelines show what a reasonable cruise line should have done.

e. Moreover, CARNIVAL knew or should have known of these risk-creating and/or dangerous conditions for other reasons that will be revealed through discovery.

20.   At all times relevant, the subject ramp was unreasonably dangerous, risk-creating, defective, improperly designed, improperly installed, and/or otherwise unsafe.

21.     The subject ramp lacked adequate safety features to prevent or minimize DECEDENT'S incident and/or injuries.

22.     These hazardous conditions were known, or should have been known, to CARNIVAL in the exercise of reasonable care.

23.     These hazardous conditions existed for a period of time before the incident.

24.     At all times relevant, CARNIVAL failed to adequately inspect the dangerous conditions, and CARNIVAL failed to adequately warn DECEDENT of the dangers.

25.     At all times relevant, CARNIVAL failed to maintain the dangerous conditions.

26.     At all times relevant, CARNIVAL had the ability to remedy the dangerous conditions, but failed to do so.

27.     These conditions were neither open nor obvious to DECEDENT, and CARNIVAL failed to reasonably warn DECEDENT. For example, CARNIVAL failed to warn DECEDENT that he should have gone to the second floor if he was using a scooter, which lacked ramps as dangerous as the subject ramp.

28.     At all times relevant, CARNIVAL participated in the design and/or approved the design of the dangerous conditions involved in DECEDENT'S incident.

29.     At all times relevant, CARNIVAL participated in the installation and/or approved the installation of the dangerous conditions involved in DECEDENT'S incident.

30.     At all times material, Dr. KISHORE AINDALA (collectively referred to, together with any other physicians not listed here involved in the treatment, or lack thereof, of DECEDENT as the ship's "physicians" or "doctors") were employees or agents of CARNIVAL, as the ship's physicians and were at all times material acting within the scope and course of their employment or agency with CARNIVAL.

31.   At all times material, BORIS JOSIFOVSKI, R.N., (collectively referred to, together with any other nurses and staff members not listed here involved in the treatment, or lack thereof, of DECEDENT, as the ship's "nurses") were employees or agents of CARNIVAL and were at all times material acting within the scope and course of their employment or agency with CARNIVAL.

### COUNT I
### NEGLIGENT FAILURE TO REMEDY AGAINST CARNIVAL

32.   THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31, as if set forth herein.

33.   CARNIVAL owed a duty to exercise reasonable care under the circumstances for the safety of its passengers.

34.   This duty includes, but is not limited to, the duty to provide its passengers reasonable care by adequately remedying the subject ramp to make sure it was less steep, and otherwise safe for the use and enjoyment of its passengers. CARNIVAL knows it has elderly passengers accessing its theaters in wheelchairs, scooters, and other such devices, that require a gentle slope.

35.   At all times material, CARNIVAL, through its vessel, crew, agents, employees, staff and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL breached the duty of reasonable care owed to DECEDENT and were negligent by failing to adequately remedy the subject ramp to make sure it was reasonably safe, such that DECEDENT's incident occurred.

36.   CARNIVAL either knew or should have known of this risk-creating and/or dangerous conditions, due to reasons that include, but are not limited to, the reasons discussed in paragraph 21 of the instant Complaint.

37.   These risk-creating and/or dangerous conditions were caused by CARNIVAL'S failure to adequately remedy the subject ramp to make sure it was reasonably safe.

38.   As a direct and proximate result of the negligence of CARNIVAL, DECEDENT suffered severe injuries and died.

39.   As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

40.   As a result of the negligence of CARNIVAL, as heretofore described, CHRISTINA ANNUCCI has lost DECEDENT's social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT II
## NEGLIGENT FAILURE TO WARN OF DANGEROUS CONDITIONS AGAINST CARNIVAL

41.   THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31, as if set forth herein.

42.   At all times relevant, CARNIVAL owed a duty to exercise reasonable care under the circumstances for the safety of its passengers, including DECEDENT.

43.   Such duty includes, but is not limited to, the duty that CARNIVAL owes to warn passengers of any dangers that it knew or should have known were not open and obvious to DECEDENT.

44.   Such duty also includes, but is not limited to, the duty to warn passengers of hazards,

which passengers may reasonably be expected to encounter.

45.     At all times material, CARNIVAL, through its vessel, crew, agents, employees, staff and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL, breached the duty of reasonable care owed to DECEDENT and was negligent by failing to warn DECEDENT of the dangerous conditions.

46.     Furthermore, CARNIVAL knew or should have known of these risk-creating and/or dangerous conditions for the reasons discussed in paragraph 21 of this Complaint.

47.     The risk-creating and/or dangerous conditions were also created by CARNIVAL.

48.     CARNIVAL failed to adequately ensure there was no dangerous condition that passengers needed to be warned of, and/or CARNIVAL failed to warn DECEDENT despite knowing of the danger.

49.     These risk-creating and/or dangerous conditions existed for a period of time before the incident.

50.     These risk-creating and/or dangerous conditions were neither open nor obvious to DECEDENT.

51.     As a direct and proximate result of the negligence of CARNIVAL through its employees/agents, as described above, DECEDENT suffered severe injuries and died.

52.     As a result of the negligence of CARNIVAL, through its employees/agents as heretofore described, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

53.     As a result of the negligence of CARNIVAL, as heretofore described, CHRISTINA ANNUCCI has lost DECEDENT's social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT III
## NEGLIGENT DESIGN, INSTALLATION, AND/OR APPROVAL OF THE SUBJECT RAMP AGAINST CARNIVAL

54.     THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31, as if set forth herein.

55.     At all times material hereto, CARNIVAL owed a duty to its passengers, and in particular a duty to DECEDENT, not to permit the dangerous conditions to be in places where they could harm passengers, as well as to design and install reasonable safeguards.

56.     At all times material hereto, CARNIVAL participated in the design process of the subject vessel by generating design specifications for the shipbuilder to follow, and to put the vessel on which DECEDENT was injured into the channels of trade, and/or CARNIVAL approved of the subject vessel's design, including the design of the subject ramp.

57.     At all times material hereto, CARNIVAL manufactured, designed, installed, and/or approved of the CARNIVAL *Horizon*, including providing specifications to the shipbuilder in the original build process, and/or during its refurbishments, and as such owed a duty to its passengers, and in particular a duty to DECEDENT, to design, install and/or approve of the subject ramp without any defects.

58.     At all times material hereto, CARNIVAL through its vessel, crew, agents and/or employees who were acting in the course and scope of their employment and/or agency with

CARNIVAL, designed, installed, and/or approved of the subject ramp involved in DECEDENT'S incident, which was also in violation of the applicable industry standards/recommendations and/or other guidelines.

59.    CARNIVAL provides design elements of the vessels to the ship builder and/or approves of design elements which include the subject ramp.

60.    CARNIVAL maintains the contractual right to participate, review, modify, and/or reject the design plans and drawings of the vessels, including the CARNIVAL *Horizon*, during the new build process.

61.    CARNIVAL has the right to enter the ship and inspect it during construction to ensure that it is being constructed in accordance with the design specifications and has a right to insist on changes when safety concerns are identified.

62.    CARNIVAL has the right to inspect and reject design elements before taking possession of the ship.

63.    However, CARNIVAL permitted the dangerous conditions to be present, without correcting these design deficiencies, and CARNIVAL did not design and install reasonable safeguards.

64.    Furthermore, CARNIVAL knew or should have known of these risk-creating and/or dangerous conditions for the reasons discussed in paragraph 21 of this Complaint.

65.    The design flaws that made the subject ramp involved in DECEDENT'S incident unreasonably dangerous were the direct and proximate cause of DECEDENT'S injuries and death.

66.    CARNIVAL is liable for the design flaws of the vessel, including of the subject ramp involved in DECEDENT'S incident, which it knew or should have known of.

67.    CARNIVAL failed to correct and/or remedy the defective conditions, despite the fact

that CARNIVAL knew or should have known of the danger(s).

68.    As a direct and proximate result of the negligence of CARNIVAL through its employees/agents, as described above, DECEDENT suffered severe injuries and died.

69.    As a result of the negligence of CARNIVAL, through its employees/agents as heretofore described, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

70.    As a result of the negligence of CARNIVAL, as heretofore described, CHRISTINA ANNUCCI has lost DECEDENT's social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT IV
## VICARIOUS LIABILITY FOR THE NEGLIGENT DESIGN, INSTALLATION, AND/OR APPROVAL OF THE SUBJECT RAMP AGAINST CARNIVAL

71.    THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31, as if set forth herein.

72.    This is an action against CARNIVAL for its vicarious liability for the active negligence of its employees for their negligent design, construction and selection of the subject area.

73.    **DUTIES OWED BY CARNIVAL**. At all times material herein, the crew aboard the CARNIVAL *Horizon* were the employees of CARNIVAL. CARNIVAL is therefore vicariously

liable for the active negligence of its crew for their negligent design, construction and selection of the subject area. CARNIVAL therefore owes a duty to exercise reasonable care for the safety of its passengers by and through its employees. CARNIVAL'S crew have a duty of care which includes to design, construct and select materials for all areas and features of its vessels, including the subject area, as part of their duty of reasonable care under the circumstances. CARNIVAL'S crew had a duty to design the subject area including the subject ramp in a reasonably safe manner and in accordance with industry standards.

74.    At all times material hereto, CARNIVAL'S employees assigned to design, construct and/or select materials for CARNIVAL ships were subject to the control and/or right to control by CARNIVAL. CARNIVAL operated, controlled and/or maintained departments of employees who are designated and/or responsible for the design, construction and/or selection materials of CARNIVAL ships. Similarly, CARNIVAL operated, controlled and/or maintained departments of employees who are responsible for repairs, redesign, upgrades, updates and/or modifications of areas onboard CARNIVAL ships. CARNIVAL was responsible for among other things and without limitation overseeing the operations of its employees who design, construct and/or select materials for CARNIVAL ships and/or responsible for repairs, redesign, upgrades, updates and/or modifications of areas onboard CARNIVAL ships; selecting, purchasing and maintaining designs, construction and/or selection of materials for its ships; training, evaluating, managing and coaching employees responsible for the design, construction and/or selection of materials for its ships; and establishing rules, protocols and/or procedures for employees responsible for the design, construction, selection of materials, repairs, redesign, upgrades, updates and/or modifications of CARNIVAL'S ships.

75.    Upon information and belief and at all times material hereto CARNIVAL employs,

operates and/or otherwise controls departments which are designated and/or otherwise assigned to design, construct, select materials of ships as well as repairs, redesign, upgrades, updates and/or modifications to existing ships. Upon information and belief and at all times material hereto these departments include, but may not be limited to, the New Build Department and Refurbishment Departments. CARNIVAL'S departments, including the New Build and Refurbishment departments, plan, organize, operate and/or control the design, construction, selection of materials, repairs, redesign, upgrades, updates and/or modifications to CARNIVAL ships. These employees create, review, and/or approve all designs, construction, selection of materials, repairs, redesign, upgrades, updates and/or modifications to CARNIVAL ships. To do so, these employees work individually and in teams, and undergo regular and continuous meetings amongst the responsible departments as well as CARNIVAL employees who work onboard and/or visit CARNIVAL'S ships.

76.   CARNIVAL'S employees custom designed and custom built the CARNIVAL *Horizon* to their specifications. CARNIVAL employees participated in and/or approved of the design of the subject area, including the unreasonably steep ramp and lack of adequate handrails. CARNIVAL'S employees participated in and/or approved of the selection of the materials for the subject area, including the subject ramp. CARNIVAL's employees participated in and/or approved of the installation of the materials for the subject area including the subject ramp. CARNIVAL'S employees chose to install this same and/or similar ramp throughout its fleet. CARNIVAL'S employees continue to repair, modify and/or install the same and/or similar ramp on all its ships, including the CARNIVAL *Horizon*. At all times CARNIVAL'S employees had the ultimate control over the design and construction of the CARNIVAL *Horizon*. CARNIVAL'S employees had the right to inspect both the designs on paper and the design and construction at the yard.

CARNIVAL'S employees had the right under its contract with the yard to approve or reject the design, construction and selection of all materials to construct all aspects of the CARNIVAL *Horizon* and all other CARNIVAL ships within the fleet including the same and/or similar ramp. CARNIVAL'S employees had the right to reject any and all items, designs and construction. CARNIVAL'S employees held the ultimate control under their contract with the yard to withhold payment if an item or design is rejected or at issue and not resolved. CARNIVAL'S employees approved of the design, construction, and selection of materials of the subject area demonstrated by the fact that CARNIVAL has operated and maintained the ship continuously since on or about 2018.

77.    CARNIVAL'S employees knew or should have known that the subject area, including the subject ramp it chose and installed on the CARNIVAL *Horizon* was unreasonably dangerous.

78.    CARNIVAL'S employees knew or should have known of the dangerousness of the subject area, including the subject ramp since its installation in 2018.

79.    **NOTICE IS NOT REQUIRED FOR EMPLOYEE NEGLIGENT ACTS**. CARNIVAL is vicariously liable for negligent acts of its employees. A passenger is not required to establish that a shipowner had actual or constructive notice of a risk-creating condition to hold a shipowner liable for the negligent acts of its employees. *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1169-1170 (11th Cir. 2021). In this case CARNIVAL'S employee' negligent acts caused DECEDENT'S incident. Specifically, CARNIVAL'S employees were negligent by approving, designing, constructing, and/or selecting the materials for subject area including the subject ramp on board the CARNIVAL *Horizon* where the subject incident occurred. CARNIVAL'S employees failed to design, construct, select, approve and/or select materials that complied with industry

standards. The design and/or materials CARNIVAL'S employees chose, selected, approved of and/or installed for the subject area on board the CARNIVAL *Horizon* were unreasonably dangerous.

80.    Nevertheless, CARNIVAL'S crew either had actual notice and/or had constructive notice of the dangerous condition as alleged in paragraph 21 above and incorporated herein.

81.    **CARNIVAL BREACHED ITS DUTIES**. CARNIVAL'S employees breached their duties of care owed to DECEDENT and were negligent by approving, designing, constructing, and/or selecting the materials for the subject ramp on the CARNIVAL *Horizon* where the subject incident occurred. CARNIVAL'S employees failed to design, construct, select, approve and/or select materials that complied with industry standards. The design and/or materials CARNIVAL'S employees chose, selected, approved of and/or installed for the subject area on board the CARNIVAL *Horizon* were unreasonably dangerous.

82.    **PROXIMATE CAUSE**. CARNIVAL'S employees' negligent design, construction, and selection of materials for the subject area on board the CARNIVAL *Horizon* proximately caused DECEDENT's injuries and death. Had CARNIVAL's employees properly and/or reasonably designed, constructed and selected the subject area on board the CARNIVAL *Horizon*, DECEDENT would have never fallen, sustained injuries, and died as a direct result of the subject fall.

83.    **DAMAGES**. As a direct and proximate result of the negligence of CARNIVAL through its employees/agents, as described above, DECEDENT suffered severe injuries and died.

84.    As a result of the negligence of CARNIVAL, through its employees/agents as heretofore described, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

85. As a result of the negligence of CARNIVAL, through its employees/agents as heretofore described, CHRISTINA ANNUCCI has lost DECEDENT's social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT V
## VICARIOUS LIABILITY AGAINST CARNIVAL FOR THE ACTS OF THE SHIP'S MEDICAL STAFF

86. THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31, as if set forth herein.

87. CARNIVAL, through the ship's medical staff (including its physicians and nurses), and the ship's crew, owed a duty to exercise reasonable care under the circumstances for the safety of its passengers.

88. Such duties include, but are not limited to, providing such medical care and assistance as would an ordinarily prudent person under the circumstances.

89. At all times material, the ship's medical staff (including its physicians and nurses), and the ship's crew, were full-time employees and agents of CARNIVAL, subject to its direction and control, who were engaged in the activity of discharging CARNIVAL'S obligation to make such medical aid and assistance available to its passengers as would an ordinarily prudent person under the circumstances.

90.    CARNIVAL is estopped to deny that the ship's medical staff (including its physicians and nurses), and the ship's crew, were its agents and/or employees and/or servants.

91.    CARNIVAL directly paid the ship's medical personnel and regular crew a salary (i.e., payment by time) for their work in the ship's hospital and in treating passengers.

92.    CARNIVAL created, owned, directly provided, and operated, the medical center to be used by the ship's medical personnel and passengers.

93.    CARNIVAL pays to stock the medical center with all supplies, medical machinery, various medicines, and equipment to be used therein, regularly stocking and restocking same.

94.    CARNIVAL collected all medical revenues directly from passengers and generated a profit on the sale of medical services, supplies, and equipment made by the ship's medical personnel to the passengers of the vessel.

95.    CARNIVAL'S marketing materials described the medical center in proprietary language.

96.    The ship's medical personnel were members of the ship's crew; they were subject to the ship's discipline; they were required to wear the ship's uniforms; they (and, in particular, the ship's physicians) were members of the ship's officer's compliment, and at all times they were subject to termination, or other discipline, by CARNIVAL.

97.    CARNIVAL provided the ship's medical personnel and regular crew certain forms of liability insurance and/or indemnification rights.

98.    At all times material hereto, CARNIVAL, through the ship's medical staff (including its physicians and nurses), and the ship's crew, breached its duties as follows:

   a)  Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial

fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

   b) Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about rhabdomyolysis or acute kidney injury (AKI).

   c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao,

preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI'S refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i) Permission to keep DECEDENT on the ship was not properly obtained from

DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j) CARNIVAL should have paid for the medical evacuation and sought collection afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k) DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l) Although financial considerations may have been present, the ultimate responsibility for DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have figured out how to resolve any financial issues later.

m) Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from CHRISTINA ANNUCCI;

n) In failing to properly assess the condition of DECEDENT;

o) In failing to timely and appropriately treat DECEDENT, including by taking an

unreasonably long amount of time to medically evacuate him;

p) In failing to send him to a facility that could adequately treat him;

q) In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

99. DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

100. His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

101. If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been prevented.

102. The delayed medical evacuation contributed to clinical ramp and preventable complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

103. Under the doctrine of *Respondeat Superior*, employers are vicariously liable for the acts or omissions by their employees and/or other agents within the course of their employment and/or agency.

104. CARNIVAL is therefore vicariously liable for the injuries, damages, and death sustained by DECEDENT as a result of the acts of the ship's medical staff (including its physicians and nurses), and the ship's crew.

105. At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell

below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

106.  The acts of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, proximately caused DECEDENT great bodily harm in that, but for these acts, DECEDENT'S injuries and death would not have occurred.

107.  CARNIVAL, through its employees and agents, including the ship's medical staff, knew or should have known that the medical procedures they employed violated and/or did not meet reasonable standards of medical care.

108.  As a direct and proximate result of the acts of CARNIVAL through its employees/agents, as described above, DECEDENT suffered severe injuries and died.

109.  Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

110.  As a result of the acts of CARNIVAL, through its employees/agents as heretofore described, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

111.  As a result of the acts of CARNIVAL, through its employees/agents, as described above, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

112.  The conduct of CARNIVAL'S crewmembers referenced above constituted an intentional tort. Moreover, CARNIVAL encouraged and ratified the acts of these crewmembers though means that include, but are not limited to, its culture of promoting doctors, nurses, and medical staff who minimize costs as much as possible, including, but not limited to, refusing to pay for the

cost of transportation and/or medical evacuations, as this makes more money for CARNIVAL. Accordingly, an award of punitive damages is warranted in this case, in addition to the compensatory damages referenced above and below.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, punitive damages, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

**COUNT VI**
**APPARENT AGENCY FOR THE ACTS OF THE SHIP'S MEDICAL STAFF**

113.  THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31, as if set forth herein.

114.  At all times material hereto, the ship's medical staff and regular crew represented to DECEDENT and to the ship's passengers as employees and/or agents and/or servants of CARNIVAL, in that:

a.  The medical staff wore a ship's uniform;

b.  The medical staff ate with the ship's crew;

c.  The medical staff was under the commands of the ship's officers;

d.  The medical staff worked in the ship's medical department;

e.  The medical staff was paid a salary by CARNIVAL;

f.  The medical staff worked aboard the vessel;

g.  The medical staff spoke to DECEDENT as though they had authority to do so by CARNIVAL.

h.  That the "medical centers" are owned and operated by CARNIVAL, which pays to stock

the "medical centers" with all supplies, various medicines and equipment;

i. That the passenger is billed directly by CARNIVAL through the passengers' Sign and Sail Card, whereas the "medical staff', including the doctor and nurse, are paid salaries by CARNIVAL L, to work in the "medical centers"; and

j. That CARNIVAL has the right to hire and fire the physicians and nurses.

k. CARNIVAL offers physicians benefits including senior officer status, round-trip transportation from residence to the ship, uniforms, meals, private furnished cabins with refrigerators, telephones, computers with internet access, daily housekeeping services, and indemnification and health care;

l. CARNIVAL requires that the ship's physicians sail with the ship;

m. CARNIVAL owns, operates, and provides the onboard Medical Center for its passengers;

n. CARNIVAL allows and requires the ship's physicians and nurses to operate and provide services out of the ship's Medical Center which is provided by CARNIVAL and which is equipped by CARNIVAL;

o. CARNIVAL charges the services of the medical center, which includes services of the ship's doctors and other medical staff, and charges for the medical equipment and goods provided by CARNIVAL, to the passenger's onboard Sail and Sign Account;

p. The ship's physicians represented themselves to passengers that they are employees of CARNIVAL;

q. CARNIVAL limits the hours and area of the ship where passengers can receive medical services to the ship's Medical Center, which is staffed exclusively by shipboard medical personnel;

r. CARNIVAL publishes the Medical Center's daily office hours in its flyer distributed to

all passengers aboard its ships; and

s.  CARNIVAL requires the shipboard physicians and medical staff to be on call 24-hours to attend to passenger medical emergencies.

t.  The ship's physicians are considered to be Officers on board the vessel and members of the crew, and were introduced to the passengers as the ship's Officers.

u.  Both the ship's doctors and the nurses were held out to the passengers by CARNIVAL as members of the ship's crew.

v.  CARNIVAL puts the ship's physicians and nurses under the command of the ship's superior officers, including the Master of the ship.

w.  CARNIVAL represents to immigration authorities that the physicians and nurses are members of the ship's crew.

x.  CARNIVAL'S physicians and nurses provide medical services on the ship and DECEDENT had no alternative to the ship's medical care.

115.  In addition, CARNIVAL further represented to DECEDENT that the vessel's medical staff and regular crew were agents and/or employees of CARNIVAL through its marketing materials and through other official statements that described the medical center in proprietary language, including language such as the "CARNIVAL *Horizon*'s Medical Center/our infirmary/our medical center," and through encouraging DECEDENT to make use of "its" infirmary/medical center if DECEDENT was in need of medical attention.

116.  Furthermore, at no time did CARNIVAL represent to DECEDENT in particular, or the ship's passengers in general, in a meaningful way that the vessel's medical staff and regular crew were not agents or employees of CARNIVAL.

117. At all material times, DECEDENT reasonably relied on the representations to

DECEDENT'S detriment that the medical staff and regular crew were employees, and/or agents, and/or servants of CARNIVAL.

118. It was reasonable to believe that the medical staff and regular crew were CARNIVAL'S agents because they wore a ship's uniform. In addition, at all times material, the medical staff spoke and acted as though they were authorized to do so by CARNIVAL.

119. This reasonable reliance was detrimental because it delayed DECEDENT from receiving proper medical treatment and/or DECEDENT would not have gone on the subject cruise with CARNIVAL had DECEDENT known that the medical staff and regular crew on the ship were not CARNIVAL'S agents.

120. CARNIVAL is estopped to deny that the medical staff and regular crew were its apparent agents, and/or apparent employees, and/or apparent servants.

121. CARNIVAL had a duty to provide DECEDENT with reasonable care under the circumstances and through the acts of its apparent agents breached its duty to provide DECEDENT with reasonable care under the circumstances.

122. DECEDENT'S injuries were aggravated due to the fault of CARNIVAL through the acts of its apparent agents as follows:

a) Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

  b) Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about rhabdomyolysis or acute kidney injury (AKI).

  c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao, preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI's refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i) Permission to keep DECEDENT on the ship was not properly obtained from DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j) CARNIVAL should have paid for the medical evacuation and sought collection

afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k)  DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l)  Although financial considerations may have been present, the ultimate responsibility for DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have figured out how to resolve any financial issues later.

m)  Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from CHRISTINA ANNUCCI;

n)  In failing to properly assess the condition of DECEDENT;

o)  In failing to timely and appropriately treat DECEDENT, including by taking an unreasonably long amount of time to medically evacuate him;

p)  In failing to send him to a facility that could adequately treat him;

q)  In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

123.  DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward

Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

124.  His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

125.  If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been prevented.

126. The delayed medical evacuation contributed to clinical ramp and preventable complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

127.  As a direct and proximate result of the acts of CARNIVAL through its  apparent agents, as described above, DECEDENT suffered severe injuries and died.

128.  Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

129.  At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

130. As a result of the acts of CARNIVAL, through its apparent agents as heretofore described, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

131.  As a result of the acts of CARNIVAL, through its apparent agents as heretofore

described, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

132. The conduct of CARNIVAL'S apparent agents referenced above constituted an intentional tort. Moreover, CARNIVAL encouraged and ratified the acts of these apparent agents though means that include, but are not limited to, its culture of promoting doctors, nurses, and medical staff who minimize costs as much as possible, including, but not limited to, refusing to pay for the cost of transportation and/or medical evacuations, as this makes more money for CARNIVAL. Accordingly, an award of punitive damages is warranted in this case, in addition to the compensatory damages referenced above and below.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, punitive damages, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

**COUNT VII**
**ASSUMPTION OF DUTY FOR THE NEGLIGENCE OF THE SHIP'S MEDICAL STAFF**

133. THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1-31 as if set forth herein.

134. CARNIVAL owed DECEDENT the duty to exercise reasonable care under the circumstances for the safety of its passengers.

135. Such duties include, but are not limited to, providing such medical care and assistance as would an ordinarily prudent person under the circumstances.

136. CARNIVAL elected to discharge this duty by having DECEDENT seen by its own ship's physicians and/or other crew members.

137.  As such, CARNIVAL voluntarily assumed a duty for the benefit of DECEDENT to use reasonable care in the provision of medical services to DECEDENT.

138.  At all times material hereto, CARNIVAL, through the ship's medical staff (including its physicians and nurses), and the ship's crew, was careless, negligent, and breached its duties as follows:

a)  Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

b)  Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion

and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about rhabdomyolysis or acute kidney injury (AKI).

c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao, preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI'S refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental

status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i) Permission to keep DECEDENT on the ship was not properly obtained from DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j) CARNIVAL should have paid for the medical evacuation and sought collection afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k) DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l) Although financial considerations may have been present, the ultimate responsibility for DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have figured out how to resolve any financial issues later.

m) Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's

medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from CHRISTINA ANNUCCI;

n) In failing to properly assess the condition of DECEDENT;

o) In failing to timely and appropriately treat DECEDENT, including by taking an unreasonably long amount of time to medically evacuate him;

p) In failing to send him to a facility that could adequately treat him;

q) In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

139. DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

140. His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

141. If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been prevented.

142. The delayed medical evacuation contributed to clinical ramp and preventable complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

143. At all times material hereto, the aforementioned acts or omissions on the part of

CARNIVAL fell below the standard of care.

144. CARNIVAL'S negligence proximately caused DECEDENT great bodily harm in that, but for CARNIVAL'S negligence, DECEDENT'S injuries would not have occurred, would have been substantially lessened, and/or would not have been aggravated.

145. CARNIVAL, through its employees and agents, to wit, the ship's medical staff and regular crew, knew, or should have known, that the medical and first aid procedures they employed violated reasonable standards of medical care.

146. The negligence of CARNIVAL proximately caused DECEDENT great bodily harm in that, but for CARNIVAL's negligence, DECEDENT'S injuries and death would not have occurred.

147. CARNIVAL knew or should have known that the medical procedures its doctors, nurses, and medical staff employed violated and/or did not meet reasonable standards of medical care.

148. As a direct and proximate result of the negligence of CARNIVAL, as described above, DECEDENT suffered severe injuries and died.

149. Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

150. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

151. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT VIII
## NEGLIGENT SELECTION OF THE SHIP'S MEDICAL STAFF

152.  THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1 through 41 as if set forth herein.

153.  Because CARNIVAL elected to hire medical personnel to treat its passengers on its ships, it had a duty to vet, select, and/or hire medical personnel who were adequately qualified, trained, and experienced to work aboard its ships and to adequately conduct examinations, conduct evaluations, treat, and make arrangements for the proper treatment for its passengers.

154.  At all times material, CARNIVAL, through its officers, managers, recruiters, vessel, and/or other agents, employees, staff, crew, and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL, breached the duty of reasonable care owed to DECEDENT and was negligent through negligently vetting, selecting, and hiring its shipboard doctors, nurses, and/or other medical personnel, whom CARNIVAL knew or should have known were dangerous, incompetent, unqualified, and/or liable to do harm.

155. CARNIVAL failed to conduct a reasonable investigation regarding the competence of the ship's doctors, nurses, and medical staff to be employed as staff for CARNIVAL'S medical center, including failing to adequately evaluate its doctors', nurses', and other medical personnel's performance during their tenure with CARNIVAL, including, but not limited to, by failing to properly

review and/or analyze their success record in how often they were able to adequately treat patients' injuries, and failing to adequately discipline and/or terminate their employment when their success record was inadequate and/or improper.

156. Likewise, CARNIVAL failed to ensure that the doctors, nurses, and other medical personnel it hired understood the standard of care for emergency physicians and staff, and the doctors, nurses, and other medical personal failed to follow the standard of care for emergency physicians and staff.

157. Prior to the course of employment of said doctors, nurses, and medical staff, CARNIVAL became aware or should have become aware of problems with said doctors, nurses, and medical staff that indicated their unfitness and/or predisposition to committing errors, for reasons that include, but are not limited to, that said doctors, nurses, and medical staff previously committed the same errors as those in the instant case prior to working for CARNIVAL, CARNIVAL received complaints of their incompetence, and/or they did not have adequate training, qualifications, or experience for treating patients, which indicated their unfitness and/or predisposition to committing errors, but CARNIVAL nonetheless hired them. CARNIVAL intentionally misrepresented to the public, DECEDENT, and CHRISTINA ANNUCCI that said doctors, nurses, and medical staff had adequate training, qualifications, or experience for treating patients.

158. At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

159. CARNIVAL knew or should have known that the ship's doctors, nurses, and medical

staff were dangerous and incompetent and liable to do harm to its passengers.

160.  Therefore CARNIVAL owed DECEDENT and its other passengers a duty of care, when hiring doctors, nurses, and medical staff, to hire only competent professionals.

161.  CARNIVAL breached its duty of care to DECEDENT by hiring incompetent doctors, nurses, and medical staff.

162.  As a proximate result, CARNIVAL'S doctors, nurses, and medical staff did not have the ability to properly treat DECEDENT, and the ship's doctors, nurses, and medical staff were careless, negligent, and breached their duties as follows:

a)  Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

b)  Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about rhabdomyolysis or acute kidney injury (AKI).

c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao, preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI'S refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i) Permission to keep DECEDENT on the ship was not properly obtained from DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j) CARNIVAL should have paid for the medical evacuation and sought collection afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k) DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l) Although financial considerations may have been present, the ultimate responsibility for DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have

figured out how to resolve any financial issues later.

m) Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from CHRISTINA ANNUCCI;

n) In failing to properly assess the condition of DECEDENT;

o) In failing to timely and appropriately treat DECEDENT, including by taking an unreasonably long amount of time to medically evacuate him;

p) In failing to send him to a facility that could adequately treat him;

q) In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

163. DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

164. His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

165. If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been prevented.

166. The delayed medical evacuation contributed to clinical ramp and preventable

complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

167. CARNIVAL knew or reasonably should have known that the doctors, nurses, and medical staff were incompetent or unfit, for reasons that include, but are not limited to, CARNIVAL's failure to adequately vet, inspect, and inquire into the credentials of the doctors, nurses, and medical staff before hiring them, and because the doctors, nurses, and medical staff it hired lacked the qualifications to be competent doctors, nurses, and medical staff and had prior incidents of medical misconduct according to their work history, licensing, background, and material that they themselves submitted to CARNIVAL in their employment application process.

168. At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

169. As a direct and proximate result of the negligence of CARNIVAL, as described above, DECEDENT suffered severe injuries and died.

170. Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

171. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

172. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical

care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

**COUNT IX**
**NEGLIGENT RETENTION OF THE SHIP'S MEDICAL STAFF**

173. THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1 through 41 as if set forth herein.

174. Because CARNIVAL elected to retain medical personnel to treat its passengers on its ships, it had a duty to terminate its employment and/or contractual relationship with these medical personnel once it became known to CARNIVAL that these personnel were not adequately qualified, trained, and experienced to work aboard its ships and to adequately conduct examinations, conduct evaluations, treat, and make arrangements for the proper treatment for its passengers.

175. At all times material, CARNIVAL, through its officers, managers, recruiters, vessel, and/or other agents, employees, staff, crew, and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL, breached the duty of reasonable care owed to DECEDENT and was negligent through negligently retaining its shipboard doctors, nurses, and/or other medical personnel, whom CARNIVAL knew or should have known were dangerous, incompetent, unqualified, and/or liable to do harm.

176. CARNIVAL failed to conduct ongoing investigations regarding the competence of the

ship's doctors, nurses, and medical staff to be employed as staff for CARNIVAL'S medical center, including failing to adequately conduct ongoing evaluations of its doctors', nurses', and other medical personnel's performance during their tenure with CARNIVAL, including, but not limited to, by failing to properly review and/or analyze their success record in how often they were able to adequately treat patients' injuries, and failing to adequately discipline and/or terminate their employment when their success record was inadequate and/or improper.

177. Likewise, CARNIVAL failed to ensure that the doctors, nurses, and other medical personnel it retained understood the standard of care for emergency physicians and staff, and the doctors, nurses, and other medical personal failed to follow the standard of care for emergency physicians and staff.

178. During the course of employment of said doctors, nurses, and medical staff, CARNIVAL became aware or should have become aware of problems with said doctors, nurses, and medical staff that indicated their unfitness and/or predisposition to committing errors, for reasons that include, but are not limited to, that said doctors, nurses, and medical staff previously committed the same errors as those in the instant case while working for CARNIVAL, CARNIVAL received complaints of their incompetence, and/or they did not have adequate training, qualifications, or experience for treating patients, which indicated their unfitness and/or predisposition to committing errors, but CARNIVAL nonetheless retained them.

179. At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

180.  CARNIVAL knew or should have known that the ship's doctors, nurses, and medical staff were dangerous and incompetent and liable to do harm to its passengers.

181.  Therefore CARNIVAL owed DECEDENT and its other passengers a duty of care, when retaining its doctors, nurses, and medical staff, to retain only competent professionals.

182.  CARNIVAL breached its duty of care to DECEDENT by retaining incompetent doctors, nurses, and medical staff.

183.  As a proximate result, CARNIVAL'S doctors, nurses, and medical staff did not have the ability to properly treat DECEDENT, and the ship's doctors, nurses, and medical staff were careless, negligent, and breached their duties as follows:

a)  Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

b)  Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine

administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about rhabdomyolysis or acute kidney injury (AKI).

c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao, preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings

from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI'S refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i) Permission to keep DECEDENT on the ship was not properly obtained from DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j) CARNIVAL should have paid for the medical evacuation and sought collection afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k) DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l) Although financial considerations may have been present, the ultimate responsibility for

DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have figured out how to resolve any financial issues later.

m) Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from CHRISTINA ANNUCCI;

n) In failing to properly assess the condition of DECEDENT;

o) In failing to timely and appropriately treat DECEDENT, including by taking an unreasonably long amount of time to medically evacuate him;

p) In failing to send him to a facility that could adequately treat him;

q) In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

184. DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

185. His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

186. If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been

prevented.

187. The delayed medical evacuation contributed to clinical ramp and preventable complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

188. CARNIVAL knew or reasonably should have known that the doctors, nurses, and medical staff were incompetent or unfit, for reasons that include, but are not limited to, CARNIVAL's failure to adequately conduct ongoing inspections and investigations of the credentials of the doctors, nurses, and medical staff during the course of their employment and/or contractual relationship with CARNIVAL, and because the doctors, nurses, and medical staff it retained lacked the qualifications to be competent doctors, nurses, and medical staff and had prior incidents of medical misconduct according to their work history, licensing, background, and material that they themselves submitted to CARNIVAL in their employment application process.

189. As a direct and proximate result of the negligence of CARNIVAL, as described above, DECEDENT suffered severe injuries and died.

190. Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

191. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

192. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT X
## NEGLIGENT SUPERVISION OF THE SHIP'S MEDICAL STAFF

193. THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1 through 41 as if set forth herein.

194. Because CARNIVAL elected to employ and/or contract with medical personnel to treat its passengers on its ships, it had a duty to supervise these medical personnel to make sure they adequately conducted examinations, conducted evaluations, treated, and made arrangements for the proper treatment for its passengers.

195. At all times material, CARNIVAL, through its officers, managers, recruiters, vessel, and/or other agents, employees, staff, crew, and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL, breached the duty of reasonable care owed to DECEDENT and was negligent through negligently supervising its shipboard doctors, nurses, and/or other medical personnel, whom CARNIVAL knew or should have known were dangerous, incompetent, unqualified, and/or liable to do harm.

196. CARNIVAL failed to supervise its ship's doctors, nurses, and medical staff employed and/or contracted as staff for CARNIVAL'S medical center.

197. Likewise, CARNIVAL failed to supervise the doctors, nurses, and other medical personnel it employed and/or contracted with to ensure that they understood the standard of care for

emergency physicians and staff, and the doctors, nurses, and other medical personal failed to follow the standard of care for emergency physicians and staff.

198.  During the course of employment of said doctors, nurses, and medical staff, CARNIVAL became aware or should have become aware of problems with said doctors, nurses, and medical staff that indicated their unfitness and/or predisposition to committing errors, for reasons that include, but are not limited to, that said doctors, nurses, and medical staff previously committed the same errors as those in the instant case while working for CARNIVAL, CARNIVAL received complaints of their incompetence, and/or they did not have adequate training, qualifications, or experience for treating patients, which indicated their unfitness and/or predisposition to committing errors, but CARNIVAL nonetheless failed to adequately supervise them.

199.  At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

200.  CARNIVAL knew or should have known that the ship's doctors, nurses, and medical staff were dangerous and incompetent and liable to do harm to its passengers.

201.  Therefore CARNIVAL owed DECEDENT and its other passengers a duty of care, to supervise its doctors, nurses, and medical staff.

202.  CARNIVAL breached its duty of care to DECEDENT by failing to adequately supervise its doctors, nurses, and medical staff.

203.  As a proximate result, CARNIVAL'S doctors, nurses, and medical staff did not properly

treat DECEDENT, and the ship's doctors, nurses, and medical staff were careless, negligent, and breached their duties as follows:

a) Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

b) Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about

rhabdomyolysis or acute kidney injury (AKI).

c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao, preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI'S refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that

the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i)  Permission to keep DECEDENT on the ship was not properly obtained from DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j)  CARNIVAL should have paid for the medical evacuation and sought collection afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k)  DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l)  Although financial considerations may have been present, the ultimate responsibility for DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have figured out how to resolve any financial issues later.

m)  Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from

CHRISTINA ANNUCCI;

n)  In failing to properly assess the condition of DECEDENT;

o)  In failing to timely and appropriately treat DECEDENT, including by taking an unreasonably long amount of time to medically evacuate him;

p)  In failing to send him to a facility that could adequately treat him;

q)  In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

204.  DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

205.  His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

206.  If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been prevented.

207.  The delayed medical evacuation contributed to clinical ramp and preventable complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

208.  CARNIVAL knew or reasonably should have known that the doctors, nurses, and medical staff were incompetent or unfit, for reasons that include, but are not limited to, CARNIVAL's failure to adequately conduct ongoing inspections and investigations of the credentials of the doctors, nurses, and medical staff during the course of their employment and/or

contractual relationship with CARNIVAL, and because the doctors, nurses, and medical staff it failed to adequately supervise lacked the qualifications to be competent doctors, nurses, and medical staff and had prior incidents of medical misconduct according to their work history, licensing, background, and material that they themselves submitted to CARNIVAL in their employment application process.

209. As a direct and proximate result of the negligence of CARNIVAL, as described above, DECEDENT suffered severe injuries and died.

210. Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

211. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has become obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

212. As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT XI
## NEGLIGENT TRAINING OF THE SHIP'S MEDICAL STAFF

213. THE ESTATE OF RALPH ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1 through 41 as if set forth herein.

214.  Because CARNIVAL elected to employ and/or contract with medical personnel to treat its passengers on its ships, it had a duty to train these medical personnel to make sure they adequately conducted examinations, conducted evaluations, treated, and made arrangements for the proper treatment for its passengers.

215.  At all times material, CARNIVAL, through its officers, managers, recruiters, vessel, and/or other agents, employees, staff, crew, and/or representatives, who were acting in the course and scope of their employment and/or agency with CARNIVAL, breached the duty of reasonable care owed to DECEDENT and was negligent through negligently training its shipboard doctors, nurses, and/or other medical personnel, whom CARNIVAL knew or should have known were dangerous, incompetent, unqualified, and/or liable to do harm.

216.  CARNIVAL failed to train its ship's doctors, nurses, and medical staff employed and/or contracted as staff for CARNIVAL'S medical center.

217.  Likewise, CARNIVAL failed to train the doctors, nurses, and other medical personnel it employed and/or contracted with to ensure that they understood the standard of care for emergency physicians and staff, and the doctors, nurses, and other medical personal failed to follow the standard of care for emergency physicians and staff.

218.  During the course of employment of said doctors, nurses, and medical staff, CARNIVAL became aware or should have become aware of problems with said doctors, nurses, and medical staff that indicated their unfitness and/or predisposition to committing errors, for reasons that include, but are not limited to, that said doctors, nurses, and medical staff previously committed the same errors as those in the instant case while working for CARNIVAL, CARNIVAL received complaints of their incompetence, and/or they did not have adequate training, qualifications, or experience for treating patients, which indicated their unfitness and/or predisposition to committing errors, but CARNIVAL

nonetheless failed to adequately train them.

219.  At all times material hereto, the aforementioned acts and/or omissions on the part of CARNIVAL'S ship's medical staff (including its physicians and nurses), and the ship's crew, fell below the standard of care, including, but not limited to, the standards of the International Council of Cruise Lines and the American College of Emergency Physicians, which CARNIVAL advertises that its medical care meets or exceeds.

220.  CARNIVAL knew or should have known that the ship's doctors, nurses, and medical staff were dangerous and incompetent and liable to do harm to its passengers.

221.  Therefore CARNIVAL owed DECEDENT and its other passengers a duty of care, to train its doctors, nurses, and medical staff.

222.  CARNIVAL breached its duty of care to DECEDENT by failing to adequately train its doctors, nurses, and medical staff.

223.  As a proximate result, CARNIVAL'S doctors, nurses, and medical staff did not properly treat DECEDENT, and the ship's doctors, nurses, and medical staff were careless, negligent, and breached their duties as follows:

   a)  Failure to Expedite Evacuation for a Surgical Emergency:

- A displaced femoral neck fracture in an elderly patient, particularly one with atrial fibrillation (on warfarin), hypertension, and chronic lower extremity wounds, is a surgical emergency;

- The telemedicine orthopedic consult on March 5, 2024, explicitly recommended immediate hospital transfer, stating that surgery should not be delayed until reaching the U.S;

- Despite this recommendation, the patient remained on the ship under conservative management for three additional days (March 4–7), increasing the risk of fat embolism, deep vein thrombosis (DVT), pulmonary embolism (PE), and overall clinical deterioration.

b) Medical Deterioration During Delay:

- DECEDENT experienced intermittent junctional rhythms, requiring atropine administration, indicating cardiac instability;

- DECEDENT developed delirium, which could be secondary to undiagnosed fat embolism syndrome, pain, or worsening metabolic derangements;

- Given his history of warfarin use, DECEDENT was at high risk for hematoma expansion and internal bleeding, which was not adequately evaluated due to limited diagnostic resources onboard;

- DECEDENT'S urine showed dark coloration and proteinuria, raising concerns about rhabdomyolysis or acute kidney injury (AKI).

c) Delay Due to Financial and Logistical Issues:

- The ship's medical team initially recommended disembarkation and air ambulance evacuation, but CHRISTINA ANNUCCI refused hospital care in Aruba and Curacao, preferring transfer to the U.S;

- While financial considerations are valid, the medical team still bears responsibility for ensuring a patient receives appropriate care. Given the urgency of DECEDENT'S condition, alternative strategies (such as ship-arranged medical financing or liaising with consulates) should have been pursued to prevent prolonged onboard management.

d) The standard of care for a displaced femoral neck fracture in an elderly patient on anticoagulation necessitates expedited surgical intervention due to the risks of vascular compromise, thromboembolism, and systemic complications;

e) The delay of over 72 hours in transferring DECEDENT off the ship represents a significant deviation from the standard of care;

f) The ship's medical staff did not act with sufficient urgency despite repeated warnings from consultants about the need for immediate surgical intervention;

g) The financial constraints posed by CHRISTINA ANNUCCI'S refusal to seek care in Aruba or Curacao should not have prevented medical professionals from escalating the need for urgent transfer, and DECEDENT'S deterioration, including worsening mental status and cardiac rhythm abnormalities, was foreseeable and preventable had surgery been performed earlier;

h) DECEDENT was in a critical medical condition, requiring emergency medical care that the ship, its doctors, and its medical staff were not equipped to handle, and CARNIVAL knew this. DECEDENT should have been disembarked at the nearest port of call, or transported to a trauma center in the United States.

i) Permission to keep DECEDENT on the ship was not properly obtained from DECEDENT, it was only obtained from his wife, who did not have the legal right to make these decisions for him. Therefore, the against medical advice form signed by CHRISTINA ANNUCCI was not sufficient, for reasons that include, but are not limited to, the fact that it was not signed by DECEDENT.

j) CARNIVAL should have paid for the medical evacuation and sought collection

afterwards, rather than delaying and failing to medically evacuate DECEDENT in a timely fashion.

k)  DECEDENT presented with the signs and comorbidities that indicated the need to be immediately seen off the ship by a fully functional medical facility, and he should have been immediately transported off the ship to such a facility.

l)  Although financial considerations may have been present, the ultimate responsibility for DECEDENT'S proper care lies with the medical staff, who should have had him medically evacuated off the ship to a proper medical facility. CARNIVAL could have figured out how to resolve any financial issues later.

m)  Instead of airlifting DECEDENT offshore on the same day he was treated at the ship's medical center, the ship's doctor instead had him airlifted to Broward Medical in Ft. Lauderdale approximately three days after he was seen at the ship's medical center, thereby delaying his ability to get the care he needed, and did not get authorization from DECEDENT to keep him on the ship and instead only sought authorization from CHRISTINA ANNUCCI;

n)  In failing to properly assess the condition of DECEDENT;

o)  In failing to timely and appropriately treat DECEDENT, including by taking an unreasonably long amount of time to medically evacuate him;

p)  In failing to send him to a facility that could adequately treat him;

q)  In failing to adequately obtain consultations with appropriate specialists; and in deviating from the standard of care for patients in DECEDENT'S circumstances.

224.  DECEDENT was finally evacuated on March 7, 2024, via air ambulance to Broward

Health Medical Center in Fort Lauderdale, FL, but by that point, he had already suffered prolonged immobilization, worsening delirium, and cardiovascular instability.

225.  His prognosis and survival were likely worsened by the delay in surgical intervention and prolonged period of conservative management onboard.

226.  If an earlier transfer had occurred when first advised by the telemedicine orthopedic consultant, more likely than not, the complications leading to his eventual death would have been prevented.

227.  The delayed medical evacuation contributed to clinical ramp and preventable complications, increasing the likelihood that DECEDENT'S eventual outcome was negatively impacted by substandard medical decision-making aboard the cruise ship.

228.  CARNIVAL knew or reasonably should have known that the doctors, nurses, and medical staff were incompetent or unfit, for reasons that include, but are not limited to, CARNIVAL's failure to adequately conduct ongoing inspections and investigations of the credentials of the doctors, nurses, and medical staff during the course of their employment and/or contractual relationship with CARNIVAL, and because the doctors, nurses, and medical staff it failed to adequately train lacked the qualifications to be competent doctors, nurses, and medical staff and had prior incidents of medical misconduct according to their work history, licensing, background, and material that they themselves submitted to CARNIVAL in their employment application process.

229.  As a direct and proximate result of the negligence of CARNIVAL, as described above, DECEDENT suffered severe injuries and died.

230.  Had DECEDENT received the appropriate care and treatment, he more likely than not would have survived.

231.  As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has become

obligated to pay significant medical bills and other expenses for DECEDENT'S treatment and care while he was alive.

232.  As a result of the negligence of CARNIVAL, CHRISTINA ANNUCCI has lost his social security, medical insurance, and the value of his services and incurred expenses for medical care, funeral services and interment.

WHEREFORE, THE ESTATE OF RALPH ANNUCCI demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law on behalf of THE ESTATE OF RALPH ANNUCCI, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## COUNT XII
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST CARNIVAL

233.  CHRISTINA ANNUCCI hereby adopts and re-alleges each and every allegation in paragraphs 1 through 41 as if set forth herein.

234.  At all times material, due to the negligence of CARNIVAL, CHRISTINA ANNUCCI was placed inside the zone of danger and at immediate risk of physical harm.

235.  CHRISTINA ANNUCCI'S risk of physical harm included, but is not limited to, falling due to the unreasonably steep ramp and lack of adequate handrails.

236.  CARNIVAL'S negligence caused severe mental and/or emotional harm and/or distress in CHRISTINA ANNUCCI, such as fear and anxiety. These emotional injuries and/or damages have also resulted in physical manifestations, such as fits of crying, sickness, nausea, exhaustion, fatigue, headaches, insomnia, dizziness, lack of sleep, poor sleep, fright, anxiety, depression, and nightmares.

237.  As a direct and proximate result of the negligence of CARNIVAL, as described

above, CHRISTINA ANNUCCI suffered the above emotional injuries and/or damages.

WHEREFORE, the Plaintiff, CHRISTINA ANNUCCI, demands judgment against CARNIVAL, for compensatory damages, including pre-judgment interest, costs, and all damages allowable by maritime and state law for the above emotional injuries and/or damages, and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, CHRISTINA ANNUCCI, individually, and as Personal Representative of THE ESTATE OF RALPH ANNUCCI, demand trial by jury on all issues so triable.

**Dated:** February 27, 2025.

Respectfully submitted,

*/s/ Matthias M. Hayashi*
**Spencer M. Aronfeld, Esq.**
Florida Bar No.: 905161
aronfeld@Aronfeld.com
**Matthias M. Hayashi**
Florida Bar No.: 115973
mhayashi@aronfeld.com
**Abby H. Ivey, Esq.**
Florida Bar No.: 1002774
aivey@aronfeld.com
**ARONFELD TRIAL LAWYERS**
One Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
P:       (305) 441.0440
F:       (305) 441.0198
***Attorneys for PLAINTIFFS***